## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT

Mark Small
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana
Indianapolis, Indiana

Robert J. Henke
Deputy Attorney General of Indiana
Indianapolis, Indiana

James D. Boyer
Deputy Attorney General of Indiana
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| D. L., *Appellant-Defendant,* | February 2, 2016 |
| v. | Court of Appeals Case No. 28A01-1508-JT-1095 |
| Indiana Department of Child Services, *Appellee-Plaintiff* | Appeal from the Greene Circuit Court |
| | The Honorable J. David Holt, Senior Judge |
| | Trial Court Cause No. 28C01-1501-JT-6 |

**Altice, Judge.**

## Case Summary

[1] D.L. (Father) appeals the involuntary termination of his parental rights to P.L. (Child). Father challenges the sufficiency of the evidence supporting the termination of his rights.

[2] We affirm.

## Facts & Procedural History

[3] Father and K.L. (Mother) are married and have one daughter together, Child.[1] Mother also has two older sons, C.T. and H.T., from previous relationships (collectively, Siblings), who are not subjects of this appeal. The family first came to the attention of the Department of Child Services (DCS) on August 29, 2013, when Mother took Child, who was then three months old, to the Greene County Hospital emergency room with an injured arm. X-ray imaging revealed a possible fracture to Child's left elbow. The emergency room doctor ordered a CAT scan and pediatric bone survey, which confirmed the left elbow fracture and also revealed fractures to Child's clavicle and left femur in different stages of healing. Child was transported to Riley Hospital for Children, and medical staff contacted DCS.

---

[1] Because Mother's parental rights were not terminated, she does not participate in this appeal. We therefore limit our discussion of the facts to those relevant to Father's appeal.

[4] While Child remained in the hospital, Mother gave a recorded interview at the Linton Police Department. Mother stated that she did not know how Child's arm was injured, and she gave a timeline of events beginning the previous day. Mother stated that she bathed all three children at about 2:00 p.m. on August 28 and observed no injuries at that time. Mother then left for work at about 3:00 p.m., leaving the children in Father's care. When Mother returned home around 1:00 a.m. the next morning, Child was asleep. Child woke up at 6:00 a.m., and Mother fed her and put her back to bed. Mother did not notice anything wrong with Child at that time. When Child awoke at 9:00 a.m., however, Mother noticed that Child's arm was red and swollen and that Child cried when Mother tried to move it. Mother decided to take Child to the hospital, but had to wait for Father to fix a flat tire on her vehicle before she could do so. Child was seen at the emergency room at 1:30 p.m.

[5] Father was also interviewed by the police on August 29, 2013. Father agreed that Mother's timeline was accurate, but initially denied any knowledge of how Child could have been injured. Eventually, however, Father claimed that while he was tending to Child when she awoke around 11:00 p.m., the family dog bit his foot, and his reaction caused Child to slip from his grasp. Father stated that he grabbed Child by her arm as she fell and he heard a pop. Father claimed that Child began to cry and that he held her until she calmed down before putting her back to bed. Father could not explain why he had failed to inform Mother about this incident.

[6] Child and Siblings were removed from the home and placed in foster care that day. An examination of Siblings conducted upon their removal revealed a number of fresh bruises. On September 3, 2013, DCS filed petitions alleging that all three children were Children in Need of Services (CHINS). Following a fact-finding hearing, Child and Siblings were adjudicated CHINS. Following a dispositional hearing, Father was ordered to participate in reunification services, including a psychological evaluation, counseling, and supervised visitation.

[7] Father was charged with neglect of a dependent as a class D felony due to his failure to seek medical care for Child after breaking her arm. He ultimately pled guilty and served three months in jail. A protective order prohibited him from having any contact with Child until February 2014.

[8] Father attended services as ordered, but he gave inconsistent stories throughout the life of the CHINS case as to how he believed Child was injured. Although he admitted to causing Child's broken arm shortly after the injury was discovered, he later stated that he did not cause the injury and believed that Mother had done so. In an Order on Periodic Review dated August 8, 2014, the juvenile court found that Father had not made progress in services or enhanced his ability to fulfill his parental obligations. On the same date, the juvenile court adopted concurrent permanency plans of reunification and adoption for Child.

[9]     DCS filed petitions to terminate Father's and Mother's parental rights in January 2015. At a CHINS hearing in February 2015, Father's therapist, Joni Reagan, recommended ending her services with Father due to his inconsistent stories as to how Child was injured. According to Reagan, therapy with Father was not productive because without an honest explanation of what happened to Child, she was unable to assist Father in changing his behavior to prevent future injuries to Child. In an Order on Periodic Review dated March 4, 2015, the juvenile court terminated services for Mother and Father and stopped visitation, finding that "[c]ontinuation of contact between the parents and the children would be contrary to the health and welfare of the children because the parents have made no progress, do not fully engage in service[s] and continue to be a source of negative disruption in the children's lives." *Exhibit Volume*, DCS Exhibit 9. The court also changed the permanency plan to adoption.

[10]    A fact-finding hearing on the termination petition was conducted on June 9 and 10, 2015, at which DCS called numerous service providers to testify. At the conclusion of the hearing, the juvenile court took the matter under advisement. On July 24, 2015, the juvenile court issued an order terminating Father's parental rights.[2] In support of its order, the juvenile court entered the following relevant findings and conclusions:

> 15. [Child's] injuries are a particular concern, as she had fractures to the right femur and her clavicle, in various stages of

---

[2] In the same order, the juvenile court denied the petition to terminate Mother's parental rights.

healing, as well a broken left arm.  [Father] admitted that the broken left arm occurred while [Child] was in his care, but he did not seek out any treatment for [Child].  Further, he did not reveal to Mother that [Child] had been injured.  Still further, he did not reveal to [the emergency room doctor] or any other person at Greene County Hospital what he claims to have occurred that resulted in [Child's] injury to her arm.  Despite making an admission to a law enforcement officer as to how the injury to [Child's] arm occurred, and despite entering a plea of guilty to Neglect of a Dependent, a felony, [Father] has continued to deflect responsibility and to attempt to shift blame.

16.  [Father] has not demonstrated an understanding of [Child's] need for immediate medical care when first injured.  Because [Father] initially failed to seek immediate medical care for [Child's] dislocated arm and because he continued to deflect and deny responsibility related to [Child's] injury to her arm, there is a reasonable probability that the conditions that led to [Child's] removal from [Father] and continued placement outside his care will not be remedied.  There is a reasonable probability that the continuation of the parent-child relationship between [Father] and [Child] poses a threat to the well-being of [Child].  Termination of the parent-child relationship between [Father] and [Child] is in the best interests of [Child].

[11]  *Appellant's Appendix* at 14.  Father now appeals.  Additional facts will be provided as necessary.

## Discussion & Decision

[12]  When reviewing the termination of parental rights, we will not reweigh the evidence or judge the credibility of the witnesses.  *In re D.D.,* 804 N.E.2d 258, 265 (Ind. Ct. App. 2004), *trans. denied.*  Instead, we consider only the evidence

and reasonable inferences most favorable to the judgment. *Id.* In deference to the juvenile court's unique position to assess the evidence, we will set aside its judgment terminating a parent-child relationship only if it is clearly erroneous. *In re L.S.,* 717 N .E.2d 204, 208 (Ind. Ct. App. 1999), *trans. denied.* Thus, if the evidence and inferences support the decision, we must affirm. *Id.*

[13] The juvenile court entered findings in its order terminating Father's parental rights. When the juvenile court enters specific findings of fact and conclusions thereon, we apply a two-tiered standard of review. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 147 (Ind. 2005). First, we determine whether the evidence supports the findings, and second we determine whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind. 1996). A judgment is clearly erroneous only if the findings do not support the court's conclusions or the conclusions do not support the judgment thereon. *Id.*

[14] We recognize that the traditional right of parents to "establish a home and raise their children is protected by the Fourteenth Amendment of the United States Constitution." *In re M.B.,* 666 N.E.2d 73, 76 (Ind. Ct. App. 1996), *trans. denied.* Although parental rights are of constitutional dimension, the law provides for the termination of these rights when parents are unable or unwilling to meet their parental responsibilities. *In re R.H.,* 892 N.E.2d 144, 149 (Ind. Ct. App. 2008). In addition, a court must subordinate the interests of the parents to those of the child when evaluating the circumstances surrounding the termination. *In*

*re K.S.,* 750 N.E.2d 832, 836 (Ind. Ct. App. 2001). The purpose of terminating parental rights is not to punish the parents, but to protect their children. *Id.*

Before an involuntary termination of parental rights may occur in Indiana, DCS is required to allege and prove by clear and convincing evidence, among other things:

> (B) that one (1) of the following is true:
>
>> (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.
>>
>> (ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.
>>
>> (iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services[.]

Ind. Code § 31-35-2-4(b)(2)(B). DCS must also prove by clear and convincing evidence that termination is in the best interests of the child. I.C. § 31-35-2-4(b)(2)(C).

On appeal, Father argues that the evidence is insufficient to support the involuntary termination of his parental rights. Father first challenges the juvenile court's findings as to subsection (b)(2)(B)(i) and (ii). We note that DCS was required to establish only one of the three requirements of subsection

(b)(2)(B) by clear and convincing evidence before the juvenile court could terminate parental rights. *See In re L.V.N.*, 799 N.E.2d 63, 69 (Ind. Ct. App. 2003). Here, the juvenile court found that DCS presented sufficient evidence to satisfy two of those requirements, namely, that there is a reasonable probability the conditions resulting in Child's removal or continued placement outside Father's care will not be remedied and that the continuation of the parent-child relationship poses a threat to Child's well-being. *See* I.C. § 31-35-2-4(b)(2)(B)(i), (ii). We focus our inquiry on the requirements of subsection (b)(2)(B)(i)—that is, whether there was sufficient evidence to establish a reasonable probability that the conditions resulting in Child's removal or continued placement outside Father's care will not be remedied.

[17]    In making such a determination, the juvenile court must judge a parent's fitness to care for his or her child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re J.T.*, 742 N.E.2d 509, 512 (Ind. Ct. App. 2001), *trans. denied*. The court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation of the child. *Id.* In making this determination, the court may consider the parent's history of neglect and response to services offered through DCS. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a

finding that there exists no reasonable probability that the conditions will change." *In re L.S.*, 717 N.E.2d at 210.

[18] Father's challenge to the juvenile court's conclusion that there is a reasonable probability that the conditions leading to Child's removal and continued placement outside Father's care will not be remedied amounts to nothing more than a request to reweigh the evidence. Specifically, Father claims that he accepted blame for Child's broken arm as well as his failure to seek medical attention for her, and that he completed all services ordered. However, the record demonstrates that even after pleading guilty to neglect of a dependent for failing to seek medical attention for Child after breaking her arm, Father's story kept changing and he blamed Mother for breaking Child's arm. Additionally, Father blamed his father and babysitters for Child's other injuries. Although Father attended services as ordered, Father's therapist testified that she was unable to pinpoint Father's parenting deficiencies and help Father address them because he continued to give inconsistent accounts of how Child's arm was injured. Because Father made no progress toward addressing the problems that led to Child's removal, the juvenile court's finding that there is a reasonable probability that the conditions leading to Child's removal and continued placement outside Father's care would not be remedied is supported by the evidence. *See In re J.S.*, 906 N.E.2d 226, 234 (Ind. Ct. App. 2009) (explaining that "simply going through the motions of receiving services alone is not sufficient if the services do not result in the needed change, or only result in temporary change").

[19]     Father also challenges the juvenile court's conclusion that termination of his rights is in Child's best interests. In determining whether termination of parental rights is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and consider the totality of the evidence. *In re J.C.*, 994 N.E.2d 278, 290 (Ind. Ct. App. 2013). In so doing, the juvenile court must subordinate the interest of the parent to those of the child, and the court need not wait until a child is irreversibly harmed before terminating the parent-child relationship. *McBride*, 798 N.E.2d at 199. "Moreover, we have previously held that the recommendations of the case manager and court-appointed advocate to terminate parental rights, in addition to evidence that the conditions resulting in removal will not be remedied, is sufficient to show by clear and convincing evidence that termination is in the child's best interests." *In re J.S.*, 906 N.E.2d at 236.

[20]     Father argues that termination of his parental rights was not in Child's best interests because service providers reported that he parented appropriately during his supervised visits. Again, this is simply a request to reweigh the evidence. Furthermore, we note that Child's foster father testified that after visits, Child became fussy and clingy and had nightmares that caused her to wake up numerous times throughout the night drenched in sweat. After the visits were terminated, these behaviors stopped. Moreover, as explained above, Father failed to address the problems leading to Child's removal from his care, and the family case manager recommended termination as being in Child's best

interests. Accordingly, the juvenile court's finding that termination of Father's parental rights was in Child's best interests is supported by the evidence.

[21] Judgment affirmed.

[22] Robb, J., and Barnes, J., concur.